UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ANTONIA ANTOINETTE PARKER,

Plaintiff,

v.

ANDREW M. SAUL,

Defendant.

Case No. 18-cv-01845-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, REVERSING THE DECISION OF THE COMMISSIONER AND REMANDING FOR AWARD OF BENEFITS**

Re: Dkt. No. 20

## I.  INTRODUCTION

Plaintiff Antonia Antoinette Parker seeks review of the final decision of Defendant Andrew M. Saul, Commissioner of Social Security ("the Commissioner"), denying her applications for disability insurance benefits and Supplemental Security Income benefits under Titles II and XVI of the Social Security Act.  The parties have filed cross motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons stated below, the Court GRANTS Parker's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, REVERSES the decision of the Commissioner and REMANDS the case to the Social Security Administration for award of benefits.[1]

## II.  BACKGROUND

### A.  Factual Background

#### Education and Employment Background

Parker was born on April 23, 1964. Administrative Record ("AR") at 1172.  She graduated from high school in 1982 and then joined the Army, where she worked as a secretary for two years. *Id.* at 1175.  After she left the Army, she worked in customer service. *Id.*  Parker

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge pursuant to 28 U.S.C § 636(c).

completed cosmetology school in 1990. *Id.* at 380. Parker received her cosmetology license in 2001 and held various cosmetology jobs in New York. *Id.* at 1175. In 2008, she worked twenty hours a week as a spa attendant for six months. *Id.* at 381. In 2015, Parker worked 10 hours a week as a house monitor at Casa de Maria for a month. *See id.* at 73–74. Parker stopped working in this position because she "was always tired" and "did not have the energy" to do the work. *Id.* at 74.

### Parker's Medical History

Parker alleges that she is unable to work because of both physical and mental impairments as well as side effects from medication. *See id.* at 77. She was diagnosed with polycystic liver and kidney disease in 1998. *Id.* at 1404. In addition, she fell down a flight of stairs in 2008, sustaining spinal injuries and fracturing her clavicle and her "T5 and T6 spinous processes." *Id.* She began having "nerve blocks" every three months after this accident. *Id.*

Parker also has a history of physical and sexual abuse. *Id.* at 945. When she was a child, her grandparents stripped her naked and whipped her. *Id.* She was also raped in 2011, which she reported to the police. *Id.* Parker is also a victim of domestic violence and suffered both physical and emotional abuse when she lived with her ex-husband. *Id.* As a result of her history of trauma, Parker suffers from panic attacks and nightmares. *Id.* at 1317. She also suffers from major depression and anxiety disorder and experiences confusion and other side effects of her medications. *Id.* at 77, 1089.

Parker takes Morphine three times a day to manage her pain, which she says makes her drowsy. *Id.* at 79, 1174. She also takes Xanax for anxiety, Cymbalta for depression and to give her energy, Seroquel "for [her] mood and sleeping," and Prozac for her mood as well. *Id.* at 1173-74. Parker sees multiple doctors for treatment of her impairments. *See id.* The Court summarizes Parker's relevant medical treatment below.

    a. Parker's Polycystic Kidney Disease

Parker was diagnosed with polycystic kidney disease in 1998 after feeling "excruciating pain" in her back and stomach. *Id.* at 1404. Between 1998 and 2000, she had four surgeries to drain cysts on her liver and kidneys. *Id.*

Between 2000 and 2009, Parker was treated for abdominal pain from her kidney cysts at Alta Bates Summit Medical, in Oakland, California. *Id.* at 1278-1308. Philip Rich, M.D., conducted a transabdominal ultrasound on August 14, 2000 and found "[p]olycystic disease of the kidneys and liver." *Id.* at 1308. Parker went to the Emergency Department at Alta Bates Summit on December 15, 2008 complaining of constant abdominal pain she had been experiencing for approximately two weeks. *Id.* at 1286. She was treated by Ben Bonnes, M.D., who attributed Parker's pain to "ovarian cyst" and "bacterial vaginitis." *Id.* at 1290. On January 22, 2009, Patrick Perkins, M.D., took a CT of Parker's abdomen and found that:

> The liver exhibits multiple hypodensities which are all well defined and of various size from moderate to tiny. These are seen throughout the liver. The kidneys are enlarged by multiple cysts of varying size with a degree of parenchymal replacement less than usually seen with classic polycystic disease.

*Id.* at 1278.

On March 27, 2013, Clifford Wong, M.D., evaluated Parker for renal insufficiency at St. Rose Hospital. *Id.* at 944. Dr. Wong diagnosed her with renal insufficiency with reported polycystic kidney disease, given a "very strong family history" and "suspect[ed] autosomal dominant polycystic kidney disease." *Id.* at 945–6.

Parker was also referred by her primary care physician to Varun Chawla, M.D., a nephrologist at Chabot Nephrology Medical Group. *Id.* at 741. Her first appointment with Dr. Chawla was on October 24, 2013. *Id.* Parker continued to see him through September 2015. *Id.* at 1194–1240. Parker reported to Dr. Chawla that she had flank pain, "mostly right side, severe." *Id.* at 741. Dr. Chawla confirmed Parker's diagnosis of polycystic kidney disease when he examined her on October 24, 2013. *Id.* at 745. He further added that she suffers from "excruciating flank pain," the cause of which he suspected was a "cyst bleed causing acute pain." *Id.* at 746. Dr. Chawla also diagnosed Parker with chronic atrial fibrillation, anxiety and hypertension. *Id.* He recommended Vicodin for severe pain and Tylenol for mild to moderate pain. *Id.* However, he also noted that "no specific treatment has been proven to prevent or delay progression of autosomal dominant polycystic kidney disease." *Id.* Parker saw Dr. Chawla for a follow-up on November 14, 2013. *Id.* at 738. Dr. Chawla confirmed the same diagnoses, adding

anemia and hypertension, and asked Parker to follow up in three to four months. *Id.* at 739. Parker saw Dr. Chawla again on March 28, 2014 for flank pain. *Id.* at 1205–07. He prescribed Percocet for severe pain. *Id.* at 1207. Dr. Chawla saw Parker again on July 1, 2014 and noted the same diagnoses. *Id.* at 1210. However, when he treated her on February 18, 2015, Dr. Chawla also diagnosed Parker with "[a]cute renal failure syndrome," based on lab results showing that her creatinine had "jumped from baseline 1.0-1.2 to 1.6" and noted that "this could be [acute kidney injury] versus progression of [polycystic kidney disease]." *Id.* at 1212. He ordered a re-check in one to two weeks. *Id.* At a follow-up appointment on March 18, 2015, Dr. Chawla again diagnosed Parker with acute renal failure syndrome noting that on recheck her creatinine remained high at 1.5. *Id.* at 1228. He also diagnosed Parker with polycystic kidney disease and "chronic kidney disease, stage three." *Id.* At Parker's follow-up appointment on June 12, 2015, Dr. Chawla listed Parker's diagnoses as "[p]olycystic kidney disease, adult type," "[c]hronic kidney disease, stage 3," "[e]ssential hypertension," "[a]nxiety," "[a]nemia," and "[a]cute renal failure syndrome." *Id.* at 1230. He prescribed Venofer by IV weekly for three weeks in his care plan to address Parker's anemia. *Id.* Parker returned on July 17, 2015 and Dr. Chawla listed the same diagnoses as the previous visit. *Id.* at 1234. He referred Parker to a pain management specialist. He also prescribed Percocet for "severe pain." *Id.* Dr. Chawla saw Parker again on September 1, 2015, and confirmed all previous diagnoses except for acute renal failure syndrome, which was no longer listed. *Id.* at 1239.

> b. Parker's Chronic Back Pain

> > i. Alta Bates Summit

Parker went to Alta Bates Summit Medical Center emergency department on July 1, 2009 after she was hit by a car. *Id.* at 555. Stephan D. Chin, M.D., treated Parker and took x-rays of her spine. *Id.* at 556–558. Dr. Chin concluded that Parker fractured her "distal right clavicle" but did not fracture her spine. *Id.* at 558. He instructed her to ice her clavicle and wear a sling until better. *Id.* at 559. Dr. Chin prescribed Ibuprofen, Vicodin, and Flexeril. *Id.* Parker went back to the emergency room on July 11, 2009, complaining of persistent back pain, and the attending doctor, Dr. Klemenson-Chau, ordered a CT of Parker's spine. *Id.* at 546. Based on the CT and a

reevaluation of Parker's back x-ray, Dr. Klemenson-Chau concluded that Parker did have a fracture of "T5 involving the spinous process," and "[f]racture of T6 involving the spinous process." *Id.* at 546. Dr. Klemenson-Chau instructed Parker to wear a fiberglass splint. *Id.* at 547. Khalil Zahra, M.D., also consulted and confirmed "[a]cute fracture of the spinous process of T5, T6, and possibly T7." *Id.* at 543.

### ii. Washington Hospital and Dr. Banh

Parker sought treatment for chronic back pain exacerbated by a fall on July 16, 2009 at the Washington Hospital emergency room. *Id.* at 670. Mohamed Nazari, M.D., her attending physician, diagnosed Parker with a back sprain but also noted "pain syndrome: chronic" and prescribed Vicodin. *Id.* at 674. On August 19, 2009, Parker returned to the Alta Bates emergency department and was evaluated by Ronn Berrol, M.D., who noted, "[r]eview of old records show a CT that did indeed show a spinus [sic] process [fracture] last month, [i]t appears well healed." *Id.* at 540. Parker went back to the Washington Hospital emergency department on August 29, 2009, seeking treatment for thoracic back pain, reporting that the symptoms began two months earlier. *Id.* at 658. David Orenburg, M.D., the attending physician, prescribed Norco for "acute back pain." *Id.* On September 22, 2009, Dr. Banh at Mission Peaks Orthopedics to whom Parker was referred by her primary care physician, evaluated Parker's back pain. *Id.* at 565. Parker reported that the pain in her back increased to nine out of ten. *Id.* Dr. Banh noted under assessments, "thoracic spine fracture," "right distal clavicle fracture," "right radial head fracture" and "right thoracic strain." *Id.* at 566. Dr. Banh recommended "conservative" treatment of the thoracic fracture and referred Parker to a surgeon to consider surgery regarding her elbow fracture. *Id.*

On January 9, 2011, Parker returned to Washington Hospital emergency department seeking treatment for back pain, "right flank" and vomiting. *Id.* at 627. Leonard Popky, M.D., the attending physician, prescribed Vicodin and gave Parker "a lot of Zofran by IV." *Id.* Parker returned to Washington Hospital emergency department two weeks later on January 22, 2011, again seeking treatment for chronic back pain and vomiting. *Id.* Dr. Nazari, the attending physician, prescribed Vicodin and set up a Zofran IV again. *Id.* at 615. Parker went to the Washington Hospital emergency department on February 22, 2011 after suffering an assault which

exacerbated her back pain. *Id.* at 579. However, Dr. Halimi, the attending physician, found no

"evidence of spine trauma." *Id.* at 580. He prescribed Flexitril. *Id.* at 576.

### iii. St. Rose

Between July and November 2013, Parker went to St. Rose emergency department

multiple times for treatment of her chronic back pain. *Id.* at 791–932. On August 17, 2013,

Parker went to the St. Rose emergency department after falling down a flight of concrete stairs.

*Id.* at 931. Tan Nguyen, M.D., noted her back pain but found no fracture of Parker's thoracic

spine. *Id.* at 932. Dr. Nguyen administered Morphine and Zofran intravenously and gave Parker

Vicodin and Clonidine. *Id.* at 933. Parker returned a week later, with continuing back pain. *Id.* at

911. Attending physician, Dimpi Kalira, M.D., noted no fracture of the thoracic spine, but ordered

Morphine and Zofran and prescribed Norco for treatment of severe pain. *Id.* at 920. On

November 4, 2013, Parker went back to St. Rose emergency department, complaining of constant

right flank pain that had lasted more than four months and had worsened in the last few days,

reaching a level of eight out of ten. *Id.* at 836. Dr. Nguyen administered Morphine and Zofran

and prescribed Norco. *Id.* at 838, 843. Further, she notes "you have back pain, which is likely

related to your polycystic kidney disease." Parker returned to the St. Rose emergency department

two weeks later, on November 18, 2013, complaining of continued abdominal and back pain, and

attending physician, Alia Kim, M.D., gave her Morphine again. *Id.* at 817, 821.

Parker went to the St. Rose emergency department on December 2, 2013 for

lightheadedness "[a]ssociated with chest pain, [a]ssociated with tremors, dizziness." *Id.* at 806.

Parker's triage notes indicate "patient here for chest pain and severe headache . . . was doing

errands when chest pain happened with diaphoresis." *Id.* at 810. Parker was inpatient from

December 2, 2013 to December 6, 2013 and her attending physician is listed as Prasad Ghimire,

M.D. *Id.* at 747. When Parker was first admitted on December 2, 2013, Zarah Napuli, RN, noted

that Parker's speech was slurred, and she was "complaining of severe headache." *Id.* at 811.

David Wei, M.D., ordered a CT scan "[without] [c]ontrast" and Michael Faer, M.D., a radiation

oncologist, read the results, noting "[n]o acute findings" and "[n]o signs of intracranial

hemorrhage, hematoma, hydrocephalus, acute infarct, large mass, mass effect, or fracture." *Id.* at

6

784, 808–809. Dr. Wei also ordered a chest x-ray using a portable x-ray machine to determine the cause of Parker's chest pain. *Id.* at 808. Dr. Faer conducted the exam and found "[r]educed lung volumes with elevation of the hemidiaphragms compressing the lung bases, accentuating the cardiovascular mediastinal size and producing bibasilar decreased acration." *Id.* at 780. Dr. Faer also found "vascular crowing and compressional atelectasis." *Id.* Dr. Faer recommended "repeat[ing] evaluation in full inspiration for clarification" as to what was causing the basilar areas of decreased aeration. *Id.* Dr. Wei performed an EKG and found "[heart rate] 52," "sinus [bradycardic]." *Id.* at 808. Dr. Wei ordered a CT of Parker's chest, abdomen and pelvis as well. *Id.* at 782. Dr. Faer read the results and found "[n]o evidence for aortic aneurysm nor dissection" and "[n]o signs of central pulmonary embolism." *Id.* at 783. Dr. Faer also noted "[b]ilateral layering pleural effusions/compressional atelectasis, small." *Id.* At the end of the day, Dr. Ghimire, Parker's attending physician, summarized the results from her tests. *Id.* at 750. In addition to the above findings, Dr. Ghimire included "[h]ypertension," "[a]nemia," "[h]ypokalemia," and "[g]astrointestinal bleeding by history." *Id.* He made a further note to "[c]heck occult blood and GI workup." *Id.* Dr. Ghimire noted "[r]ecent CT is negative for any bleeding and headache improved at the moment." *Id.*

On December 3, 2013, Dr. Ghimire requested a consultation by Bhupinder Bhandari, M.D., for Parker's [a]nemia, anterior abdominal discomfort, nausea and vomiting." *Id.* at 751. Based on his evaluation of Parker, Dr. Bhandari recommended "[u]pper GI endoscopy" and "colonoscopy" if endoscopy is "nonrevealing." *Id.* at 752.

On December 4, 2013, Dr. Bhandari performed the upper GI endoscopy "with biopsy." *Id.* at 761. The test revealed "mild gastritis," but otherwise findings were normal. *Id.* On the same day, Dr. Kumar assessed Parker for chest pain at the request of Dr. Ghimire. *Id.* at 759. He noted that "[c]hest pain appears atypical" and planned to "check an echocardiogram" and "check stress thallium test for coronary ischemia." *Id.* at 760. On the same day, December 4, 2013, Qi Che, M.D., ordered an MR Angiogram of Parker's head "without contrast." *Id.* at 790. Dr. Faer read the test and noted "[n]o acutely significant MRA abnormality detected. Specifically, no signs of intracranial aneurysm or stenosis seen." *Id.* Later that night, Vasiliki Economou, M.D.,

performed an EEG and found "[n]ormal electroencephalogram without evidence of any epileptiform abnormalities." *Id.* at 805. Dr. Ghimire addressed the negative findings in his discharge notes, commenting that Parker's severe headache was likely a "tension headache or possible migraine." *Id.* at 748. On December 5, 2013, Dr. Khetrapal ordered an MRI of Parker's brain and brain stem, which Dr. Faer read, finding "[n]o signs of intracranial hemorrhage, hematoma, hydrocephalus, acute infarct, large mass, mass effect, or fracture." *Id.* at 793. On the same day, Shankar Prasad Ghimire, M.D., also ordered an MRI of Parker's lumbar spine. *Id.* at 791. Dr. Faer performed the MRI and noted "[n]o acutely significant MRI abnormality detected." *Id.* at 791–92.

On December 6, 2013, Dr. Bhandari performed a colonoscopy on Parker. *Id.* at 763. He diagnosed her with "[c]olonic diverticulosis" and "internal hemorrhoids." *Id.* Dr. Bhandari recommended "consideration for small bowel capsule endoscopy as an outpatient." *Id.*

Parker was discharged on December 6, 2013. In his discharge notes, Dr. Ghimire described the tests that had been performed while Parker was inpatient, and their results, and stated that Parker's "[m]edication has been adjusted and [she] needs to follow up closely with [her] primary care doctor." AR at 748. He further stated:

> [P]atient discharged home with following medications; clonidine 0.3mg one table p.o. three times a day, hydralazine 25 mg p.o three times a day, Protonix 40mg twice a day, sucralfate 1 gram twice a day, Colace 250 mg once a day, aspirin 162 mg once a day, Zocor 20mg once a day, and continue Seroquel, Prozac as before and Xanax 1mg three times a day as needed, Percocet 5/325 mg one tablet every four hours as needed for moderate-to-severe pain and Dilaudid 2 mg p.o. every six hours as needed for severe pain and advised to follow up with primary care doctor and will be referred to pain specialist for further management of chronic pain including headache and all these plan[s] explained to the patient.

*Id.* at 748.

### iv. Dr. Khetrapal

Dr. Rabin Khetrapal, of Fremont Primary Care, treated Parker from November 27, 2013 to May 7, 2014. *Id.* at 1107, 1110. Progress notes have been provided for examinations on November 27, 2013, December 11, 2013, February 7, 2014, April 23, 2014 and May 7, 2014. *Id.* at 1101-1106. In addition, Dr. Khetrapal completed a Medical Opinion re: Ability to do Work-

8

Related Activities (Physical) form on May 7, 2014. *Id*. at 1107-1110. In that form, he states that Parker can lift or carry no more than 10 pounds occasionally and can stand and walk less than two hours in an eight-hour day due to pain. *Id*. at 1108. He opines that Parker must alternate between, sitting, standing and walking frequently to alleviate her discomfort, stating that she can sit no more than 10 minutes without changing position, stand no more than 5 minutes without changing position, and must walk around every ten minutes for at least 5 minutes. *Id*. He states that Parker must be able to shift at will and needs to lie down at unpredictable intervals. *Id*. He states that she can never stoop, kneel or climb stairs or ladders and can rarely crouch or crawl. *Id*. at 1109. He states that Parker's pain and other symptoms interferes with her attention and concentration constantly and that she would need to be absent more than three times a month due to her symptoms. *Id*. at 1109-1110.

### v. Dr. Narra

Parker was referred for pain treatment to Kishore Narra, M.D., a physiatrist, by her primary care physician, Dr. Khetrapal. *Id*. at 1143. Dr. Narra treated Parker between December 2013 and June 2014. *Id*. at 1143–71. Parker first saw Dr. Narra on December 10, 2013 for a pain evaluation. *Id*. at 1166. Dr. Narra diagnosed Parker with "chronic pain syndrome, lumbago, and polycystic kidney disease." *Id*. at 1168. Dr. Narra recommended obtaining an x-ray of Parker's spine. *Id*. On December 31, 2013, Robert Huberman, M.D., took x-rays of Parker's thoracolumbar spine, finding "[s]pine alignment is unremarkable" and "minimal scoliosis." *Id*. at 1170. Parker saw Dr. Narra on the same day because she felt increased pain in her feet and hips. *Id*. at 1164. She reported that the Norco was not helping and that she could not walk because of the pain. *Id*. Dr. Narra diagnosed Parker with lumbago, chronic pain syndrome, and lesion of ulnar nerve, for which he prescribed methadone. *Id*. at 1165. On January 9, 2014, Parker saw Dr. Narra again because the night before she had "swelling in [her] whole body" and difficulty walking. *Id*. at 1161–63. Dr. Narra added diagnoses of "hypertension" and "hyperlipidemia" but kept the treatment the same. *Id*. When Parker saw Dr. Narra for a follow-up on February 28th, 2014, she said it "feels like someone is stabbing [me] in the legs." *Id*. at 1158. Dr. Narra continued treatment with methadone. *Id*. at 1159. At an appointment on March 27, 2014, Dr.

Narra diagnosed chronic pain syndrome and paresthesia of the feet. *Id.* at 1156. He discontinued the methadone because Parker told him it was "making her sleepy all the time" and instead prescribed Percocet. *Id.* at 1155–57. On April 23, 2014, Dr. Narra conducted a nerve conduction study and EMG, which showed "prolonged distal onset latency" of the left tibial motor nerve, but "all remaining nerves within normal limits." *Id.* at 1149–54. On May 23, 2014, when Parker saw Dr. Narra for a one month follow-up, he prescribed 30 mg. MS Contin once daily for her chronic pain. *Id.* at 1147. At an appointment on July 18, 2014, Dr. Narra adjusted Parker's MS Contin prescription to 15 mg. twice a day. *Id.* at 1143, 1145.

### vi. Dr. Rasheed

Parker saw Sabiha Rasheed, M.D., at Tricity Rheumatology between March 11, 2014 and November 5, 2015. *Id.* at 1259–65. Parker first sought treatment from Dr. Rasheed for low back, hip, knee and foot pain on March 11, 2014. *Id.* at 1265. Dr. Rasheed noted that Parker had a history of back pain due to osteoarthritis. *Id.* Dr. Rasheed also diagnosed Parker with trochantric bursitis and recommended application of ice and Tylenol for pain. *Id.* In addition, treatment records from Dr. Rasheed reflect diagnoses of lumbosacral spondylosis and thoracic spondylosis without myelopathy. *Id.* at 1261, 1413-1414.

Treatment notes from March 11, 2014 reflect that Dr. Rasheed ordered x-rays to evaluate Parker for osteoarthritis. *Id.* at 12654. On April 2, 2014, Dr. Robert Huberman at NorCal Imaging took x-rays of Parker's hips, thoracic spine, knees, hands, wrists, and feet. *Id.* at 1267-72. Dr. Huberman reported "mild midthoracic disc changes," "mild scoliosis," but "no other findings evident." *Id.* at 1268. Each of the other x-rays showed "[n]o significant joint related abnormality" and normal "bone architecture findings." *Id.* at 1267, 1269–72. Parker saw Dr. Rasheed again on April 2, 2014 for a follow-up. *Id.* at 1264. Dr. Rasheed diagnosed Parker with osteoarthritis of the thoracic and lumbar spine but noted "x-rays of the hands, knees, feet and hips: normal." *Id.* She changed nothing in her treatment plan. *Id.* Dr. Rasheed saw Parker again on May 8, 2014, September 9, 2014, September 28, 2015, November 5, 2015, July 26, 2016 and October 25, 2016. *Id.* at 1259–62, 1412-1417.

Treatment notes from July 26, 2016 reflect that Dr. Rasheed ordered an MRI of Parker's

lumbar spine because Parker was experiencing "radicular pain in the lower extremities." *Id*. at 1415.  She also ordered x-rays of Parker's bilateral hips and noted, "consider steroid injection if [hip] pain persists." *Id*.  On October 25, 2016, an MRI of Parker's lumber spine was performed. *Id*. at 1416.  According to the report, the alignment of the lumbar spine was normal and there was no abnormal bone marrow edema, though the MRI showed polycystic kidney disease.  *Id*.  The report also revealed a "[s]mall posterior disc protrusion at L5-S1 with no significant neural impingement." *Id*.  In treatment notes from Parker's October 25, 2016 visit to Dr. Rasheed, Dr. Rasheed observed that Parker was experiencing hip pain and lower back pain. *Id*. at 1417.  She wrote that Parker had tenderness at the "trochanter of the right hip," that her thoracic spine was "tender with paraspinal muscle spasm" and that the lumber spine was "tender at L5S1, SLRT +ve at 60 degrees, no sensory/motor deficit." *Id*.

On October 25, 2016, Dr. Rasheed completed a Residual Functional Capacity Questionnaire ("RFC Questionnaire") and on October 26, 2016 she completed a form entitled Medical Opinion re: Ability to do Work-Related Activities (Physical) ("Medical Opinion form"). AR 40-46.  In the RFC Questionnaire, Dr. Rasheed lists the following diagnoses: 1) "osteoarthritis of lumbar and thoracic spine"; 2) "Myalgia – lower back sciatica"; and 3) "Hip bursitis."  AR 40. She found that Parker had the following physical limitations:  lifting and carrying less than 10 pounds; standing less than 2 hours in an 8 hour workday; walking less than 2 hours in an 8 hour workday; sitting less than 2 hours in an 8 hour workday; limited ability to push or pull as to both upper and lower extremities; and no climbing, balancing, stooping, kneeling, crouching or crawling.  AR 40-41.  In the Medical Opinion form, Dr. Rasheed wrote that Parker was "unable to walk at this time due to pain in midback, low back and hips." *Id*. at 45.[2]

---

[2] Plaintiff's counsel alerted the ALJ at the October 27, 2016 hearing that Dr. Rasheed had completed these forms and the ALJ agreed to hold the record open for one day after the hearing to allow Parker's counsel to submit them.  *See* AR at 102-103, 109.  According to the Commissioner, counsel did not submit the forms until after the ALJ issued his decision and therefore, these records were considered by the Appeals Council but not the ALJ.  *See* Defendant's Motion at 21. Although it is not clear from the Administrative Record when Parker's counsel supplied these two records to the Social Security Administration, Parker does not dispute in her reply brief that they were submitted only to the Appeals Council and not the ALJ.

vii. Dr. Khalsa

In February of 2014, Parker was referred to Prabhjot Khalsa, M.D., at Fremont Neurology Medical Associates, by her primary care physician, Dr. Khetrapal. *Id.* at 999. Dr. Khalsa examined Parker on February 11, 2014 for "lower extremity pain and weakness." *Id.* In his assessment, he listed "[p]ain in limb," "[g]ait impairment "[p]aresthesias and numbness," "[w]eakness of muscles," and "[f]amily history of cerebral aneurysm." *Id.* at 1000. Dr. Khalsa ordered an MRI of Parker's lumbosacral and cervical spine. *Id.* At a subsequent appointment on February 20, 2014, Dr. Khalsa summarized the results of the MRI as follows:

> MRI of the cervical spine revealed C3-4, C4-5, C5-6, and C6-7 disc desiccation with mild canal stenosis and some right-sided neural foraminal stenosis at C5-6. MRI scan of the thoracic spine has revealed mild wedging along the superior end plate of T5, along with T6-7 left posterior lateral disc protrusion. Additionally, there was evidence of bilateral pleural effusions and extensive lesions identified within the right lung and/or within the hepatic parenchyma. MRI scan of the lumbar spine reveals L1-2 and L3-4, L5-S1 disc desiccation, L4-5 disc bulge, with moderate foraminal narrowing. Extensive bilateral renal cysts were demonstrated.

*Id.* at 1004. Dr. Khalsa recommended that Parker follow up with her primary care physician for "further evaluation and management of pleural effusions, lung/hepatic lesions, and bilateral renal cysts." *Id.* At the February 20, 2014 appointment Dr. Khalsa also conducted electrodiagnostic studies to attempt to determine the "underlying neuropathology" of her "ongoing pain syndrome." *Id.* at 1002–1003. He was unable to find "evidence of radiculopathy, plexopathy, or other peripheral neuropathic process" and recommended that Parker obtain a rheumatology evaluation. *Id.* at 1004.

### Parker's Mental Health Treatment

a. Treatment Providers

i. Dr. Kumar

Pradeep Kumar, M.D., a psychiatrist at Pathways to Wellness, treated Parker from November 2013 to April 2014. *Id.* at 1078-93. In his initial evaluation on November 20, 2013, he described Parker's history as follows:

> This 49-year-old Afro-American female who is treated for depression

12

and anxiety while at primary care for years. She was on Prozac 40 mg a day for four years, Wellbutrin 150 mg for four years and Xanax 0.25 mg three times a day. The patient felt current medication is not working because she has no motivation in her life. Her symptoms include chronic fatigue, depression, anhedonia, paranoid thought. People are watching her or they are doing something wrong and messing her life. She is also complaining about confusion, irritable mood, poor sleep, fatigue for few years. The patient denies auditory or visual hallucinations. Denies obsessive thoughts.

*Id.* at 1089. In the comments from Dr. Kumar's mental status examination for the same visit, on November 20, 2013, Dr. Kumar writes that Parker was "very well dressed," "cooperative," that her speech was "normal rate and rhythm," that she had "good eye contact" and no suicidal ideation, movement disorder or hallucination" and that her mood was "irritable and depressed," her affect was "restrictive" and that she has "delusions," namely, that she is "very paranoid about the people around her." *Id.* at 1091. He rated Parker's functional limitations as follows: mild restrictions of activities of daily living; moderate difficulties in maintaining social functioning/relationships; moderate difficulties in maintaining concentration, persistence of place; and moderate "episodes of decomposition and increased symptoms, each of extended duration." *Id.* at 1092. In his supporting comments he wrote, "patient has significant irritable mood. She is fatigue[d] most of the time, unable to concentrate, unable to finish her job." *Id.* He diagnosed Parker with Major Depressive Disorder, severe, and Generalized Anxiety Disorder. *Id.* Dr. Kumar increased Parker's Prozac dose to 60 mg. a day, discontinued her Wellbutrin prescription, prescribed 100mg. of Seroquel at night, and increased her Xanax prescription from .25mg. three times a day to .50 mg. three times a day. *Id.* at 1092.

When Parker returned for a follow-up on December 18, 2013, Dr. Kumar noted "[t]he patient states she is doing very well on current medications," and that Parker "is sleeping well after many, many months." *Id.* at 1086. The following month, on January 22, 2014, however, Parker still felt depressed and anxious, and reported that she was having difficulty concentrating. *Id.* at 1084–85. Dr. Kumar did not change Parker's prescriptions of Xanax, Prozac, and Seroquel at this appointment. *Id.* At Parker's next visit, on February 19, 2014, Parker complained of "more anxiety. . . depression" and "poor concentration." *Id.* at 1002. Dr. Kumar doubled her Seroquel dose "to decrease her depression and anxiety" but did not change her Xanax and Prozac

prescriptions. *Id.* at 1082. Parker returned for a follow-up visit on March 19, 2014, complaining that she was having significant concentration and focus problems. *Id.* at 1080. Dr. Kumar added "possible ADHD" to her diagnoses and prescribed Strattera. *Id.* at 1081. On April 21, 2014, Parker told Dr. Kumar that her concentration had improved but that she was "still feeling depressed." *Id.* at 1072. He noted that Parker had "significant anhedonia," had "no motivation," and was "feeling fatigue[d]." *Id.* at 1078.

ii. Dr. Hiawatha Harris

Hiawatha Harris, M.D., another psychiatrist at Pathways to Wellness, treated Parker in 2015. *Id.* at 1245–57. Dr. Harris evaluated Parker on July 21, 2015 and diagnosed her with Bipolar Affective Disorder and General Anxiety Disorder. *Id.* at 1249. Dr. Harris noted that Parker was "trying to go back to school." *Id.* at 1249. On August 13, 2015, Dr. Harris saw Parker again and confirmed the same diagnoses. *Id.* at 1247. Parker told Dr. Harris, "I'm not doing good today." *Id.* Dr. Harris prescribed Abilify, Cymbalta, Hydroxyzine, Alprazolam and Venlafaxine. *Id.* at 1244. On September 15, 2015, Dr. Harris wrote that Parker had stopped taking her Abilify, which caused "shakes." *Id.* at 1245. Dr. Harris continued her other prescriptions. *Id.* at 1244.

iii. ABODE providers

Celine Tardy, a mental health clinician at Alameda County Behavioral Health Care Services (ABODE), treated Parker weekly with psychotherapy sessions and case management from October 2013 to June 2014. *Id.* at 1095–1141, 1312-1343. Each of her reports was signed off by Jane Love, LCSW, a clinical supervisor. *Id.* In addition, at a 6-Month Re-assessment Summary/ Treatment Plan completed in April 2014 and signed by Tardy and Love, Dr. Susan Harris, a psychiatrist at ABODE, is listed as "Consultant Psychiatrist – Medication Prescription as needed." *Id.* at 1115.

On an evaluation dated November 4, 2013, Tardy listed Parker's diagnoses as PTSD and Major Depressive Disorder. *Id.* at 1313. She assigned Parker a GAF of 45. *Id.* Tardy described Parker as "alert and responsive to clinician," "orient[ed] to time and location, and [with] good insight to her physical and mental condition." *Id.* Under the heading "Symptoms Reported/Observed," Tardy wrote:

> Ms. Parker reported that she currently "feels horrible." She explained that she typically stays in bed during most days and also spends time with her family, stating that it "depends how I am feeling." She shared that she has recently had a poor appetite and has lost 15 pounds in the last week and a half. She experiences difficulty in sleeping at night (falling asleep sometimes takes two hours for her) and experiences fatigue often. Other symptoms observed included a depressed mood, hopelessness and mention of past thoughts of not wanting to live anymore. Ms. Parker reported that much "chaos" around her can make her feel overwhelmed, and that she can usually only concentrate on one major task at once. . . .
>
> Ms. Parker reported having intrusive thoughts of fear, and of something bad about to happen regularly. "I have been having panic attacks all of my life," and that she is currently [having] them every other day. . . . She expressed that being alone makes her "terrified" that something will happen to her. She said that she can be fearful there is someone in the room with her or that someone is following her. Ms. Parker seemed to be aware this was a symptom and not reality.

*Id.* at 1315.

On December 18, 2013, Tardy completed another assessment of Parker. *Id.* at 1317-1328. Tardy again listed Parker's diagnoses as PTSD and Major Depressive Disorder. *Id.* at 1317. According to Tardy, Parker was currently experiencing "intrusive thoughts of fear, panic attack (with rapid heart rate, sweating, and strong fear that 'something bad is about to happen'), paranoia, not wanting to be alone." *Id.* She also noted that Parker had "poor appetite, difficulty sleeping, depressed mood, hopelessness, isolation, history of suicidal ideation without plan or attempts, symptoms lasting for more than 6 months." *Id.* Tardy observed that Parker had "good insight on her mental condition and a strong desire to receive treatment." *Id.* at 1322. She also noted under the heading "Participant's Strengths and Resources" that Parker was "concerned for her physical appearance and makes efforts in keeping good hygiene for herself." *Id.* Parker reported that some activities she had "enjoyed in the past" included going to church, *id.* at 1324, and Tardy wrote that Parker "attend[ed] a Christian church and [was] strongly active in her religious faith." *Id.* at 1321. She also noted that Parker had also enjoyed "going to the gym" in the past and that she was "trying" to do cardio four times a week. *Id.* at 1324-1325.

Each week, Tardy met with Parker for a one-hour session during which Parker reported her mood and any other problems she faced with mental health. *Id.* at 1095-1141. On November 26, 2013, Parker reported that Dr. Kumar had prescribed Seroquel three days before and that she

had "never been this happy in [her] life before." *Id.* at 1342. Between February 5, 2014 and March 10, 2014, Parker reported feeling depressed and in physical pain, and Tardy noted "agitated mood" in her report. *Id.* at 1136-1141. On March 14, 2014, Parker forgot when and where her session with Tardy was to occur and said at a session on March 26, 2014, "[w]hen I get depressed like this, this is what happens." *Id.* at 1134. Notes from an April 9, 2014 appointment reflect that Parker was "lethargic." *Id.* at 1131. In notes from an April 18, 2014 appointment, Tardy observed that Parker was "in a lethargic mood as evidenced by slurred speech and difficulty staying focused." *Id.* at 1130. On April 21, 2014, Tardy noted "client experienced PTSD symptoms," including "intrusive thoughts of fear, panic attacks, paranoia, and not wanting to be alone." *Id.* at 1129.

Tardy completed a "6 Month Re-Assessment Summary/Treatment Plan" on April 23, 2014. *Id.* at 1113–18. Tardy gave Parker a score of 47 on the Global Assessment of Functioning Scale ("GAF")[3]. *Id.* at 1113. She again listed Parker's diagnoses as Major Depressive Disorder Major Depressive Disorder and PTSD. *Id.* In connection with the diagnosis of Major Depressive Disorder, Tardy noted "[p]oor appetite, difficulty sleeping, depressed mood, hopelessness, isolation, history of suicidal ideation without plan or attempts, symptoms lasting for more than 6 months." *Id.* at 1114. In connection with Tardy's diagnosis of PTSD, she wrote that Parker

> [h]as experienced multiple traumas including physical abuse in childhood, domestic violence during marriage, and being raped in Oakland two years ago. Currently has intrusive thoughts of fear, panic attacks (with rapid heart rate, sweating, and strong fear that 'something bad is about to happen'), paranoia, not wanting to be alone.

---

[3] Physicians use the Global Assessment of Functioning ("GAF") Scale to rate the patient's overall level of functioning and ability to carry out activities of daily living. The GAF score is measured on a scale of 0–100, with a higher number associated with higher functioning. The Diagnostic and Statistical Manual of Mental Impairments states that a GAF score of 21-30 indicates that behavior is considerably influenced by hallucinations or delusions, 31-40 indicates major symptoms, 41-50 indicates serious symptoms and functional limitations, 51-60 indicates moderate symptoms and functional limitations, and 61-70 or higher indicates mild, transient or no symptoms and limitations. A GAF score of 47 indicates "[s]erious symptoms OR any serious impairment in social, occupational, or school functioning." *Diagnostic and Statistical Manual of Mental Disorders* 34 (Am. Psychiatric Ass'n 4th ed.)(2003).

*Id.*  Tardy also noted that "[d]ue to client's PTSD and Depression, she often experiences symptoms of panic attacks, difficulty sleeping, loss of appetite, feelings of worthlessness, loss of energy, and diminished ability to concentrate."  *Id.* at 1115.

On May 5, 2014, Tardy completed a Mental Impairment Questionnaire.  *Id.* at 1095–1100.  Tardy found that Parker's current GAF was 47 and that Parker's ability to 1) carry out short, simple instructions, 2) make simple, work-related decisions, 3) maintain attention for two-hour segments, and 4) get along with co-workers or peers was "limited but satisfactory."  *Id.* at 1097.  She found Parker's ability to 1) understand and remember short, simple instructions, 2) maintain regular attendance and be punctual, and 3) sustain an ordinary routine without special supervision to be "seriously limited, but not precluded."  *Id.*  Tardy assessed Parker's ability to 1) remember work-like procedures, 2) complete a normal workday and workweek without interruptions from psychologically based symptoms, and 3) deal with normal work stress as "unable to meet competitive standards."  *Id.*  Tardy wrote "no useful ability to function" with respect to Parker's ability to perform at a consistent pace without an unreasonable number and length of rest periods."  *Id.*  As a result, Tardy concluded that Parker would have to take four or more days off per month because of her impairments.  *Id.* at 1096.  Tardy also opined that Parker's psychiatric condition exacerbated her pain.  *Id.*  She noted that "Ms. Parker's doctor has identified that she is experiencing Fibromyalgia, connected with her psychiatric condition."  *Id.*

Tardy also assessed Parker's "functional limitation" in the Mental Impairment Questionnaire.  *Id.* at 1099.  She concluded that Parker had "marked limitation" with respect to activities of daily living, maintaining social functioning and concentration, persistence, and pace.  *Id.*  Further, Tardy found that Parker would have at least four "repeated episodes of decompensation within [a] 12 month period, each of at least two weeks duration."  *Id.*  Finally, Tardy noted that "Ms. Parker would currently have difficulty working at a regular job due to side effects from pain medications.  These cause slurred speech and difficulty focus[ing], as well as decrease in memory functioning."  *Id.*

The Medical Impairment Questionnaire completed by Tardy on May 5, 2014 was signed by Dr. Susan Harris, who was the "Consultant-Psychiatrist" assigned to Parker at ABODE, on

June 17, 2014.  *Id.* at 1110.  On the same date, Dr. Harris examined Parker, noting that Parker "appear[ed] to be doing a bit better in her depressive [symptoms] since her medication was changed by her psychiatrist last month.  She is tapering off Prozac and is on 60mg/d Cymbalta." *Id.* at 1111.  Further, Dr. Harris noted that Parker is "treated for PTSD and MDD who is at risk for homelessness."  *Id.*

### b.  Examining Physicians Who Did Not Treat Parker

The record contains reports by a number of physicians who were requested to examine Parker in connection with her application for disability benefits.  These are summarized below.

### i.  Dr. Rana, M.D.

Farah Rana, M.D., a neurologist and internist, completed an internal medicine evaluation of Parker on April 12, 2016 at the request of the State agency.  *Id.* at 1400.  She examined Parker and reviewed "multiple notes" from "various primary care visits."  *Id.*  Dr. Rana found that Parker could frequently lift and carry up to ten pounds and occasionally lift and carry 11-20 pounds.  *Id.* at 1393.  She found that Parker could sit, stand and walk five hours without interruption, and six hours total in an eight-hour work day.  *Id.* at 1394.  Dr. Rana found that Parker can "handle, manipulate, feel, and finger objects without any problem.  She can stoop, bend, kneel, crouch, and climb on an occasional basis."  *Id.* at 1402.  In describing Parker's medical history, Dr. Rana noted "[s]he has a history of bipolar disorder.  She has been on medications for years.  She states that she has good days and bad days and she is not having a very good day today."  *Id.* at 1401.

### ii.  Dr. Abraham, Ph.D.

Deepa Abraham, a psychologist, completed an Adult Consultative Examination Report based on examination and psychological testing of Parker on May 20, 2014 and June 3, 2014 and a review of treatment records from Pathways to Wellness and ABODE.  *Id.* at 1172-1186.  Dr. Abraham found that "[a]ccording to the results obtained from clinical history and behavior observations, Ms. Parker meets the criteria of Mood Disorder Not Otherwise Specified" under DSM-IV.  *Id.* at 1181.  Dr. Abraham explained:

> According to the DSM-IV, a diagnosis of *Mood Disorder NOS* is generally applied
> when a person does not exhibit symptoms consistent with a specific *Mood Disorder*

18

but tends to exhibit symptoms of both *Depressive Disorder Not Otherwise Specified* and *Bipolar Disorder Not Otherwise Specified.*

*Id.* Some of the symptoms Dr. Abraham's used to support her diagnosis are: "lethargy, insomnia, apathy, poor concentration, and reduced appetite. Moreover, she maintains a socially isolative lifestyle without any friends." *Id.* Dr. Abraham also noted that Parker "exhibits a manic presentation, which consists of hostility, heightened anxiety, and reckless behavior." *Id.* Further, Dr. Abraham found that the "psychiatric hospitalization that occurred at John George Psychiatric Pavilion . . . most likely reflected a manic episode." *Id.* Dr. Abraham also pointed to the fact that Parker's son had been diagnosed with bipolar disorder in support of her opinion that "a genetic disposition underlies Ms. Parker's mood disorder." *Id.* at 1182. Dr. Abraham noted that her observations of Parker during the examination also substantiated her opinion that Parker meets the criteria of Mood Disorder Not Otherwise Specified. *Id.* She wrote that "[b]ehavior observations corroborate that Ms. Parker's mood fluctuated between irritability, tearfulness, and euthymia." *Id.*

Dr. Abraham also diagnosed Parker with Polysubstance Dependence (DSMIV code: 304.80) based on her "longstanding addiction to various substances." *Id.* In support of this conclusion, Dr. Abraham notes that had Parker abused drugs and alcohol in her twenties and that although Parker denied using alcohol in the past two years, "she failed to provide collateral documents to support her claims." She further noted that Parker "relies on heavy narcotic painkillers including [m]orphine; yet she still complains of chronic pain." *Id.* Dr. Abraham concluded that Parker's "clinical history suggests that she may be over-using prescription medicine and this may serve as a sustaining factor in her depressed mood." *Id.* She also observed that Parker slurred her speech and appeared sleepy during the tests, leading her to conclude that morphine affects Parker's ability to function normally. *Id.*

Dr. Abraham concluded that there was insufficient evidence to support the PTSD diagnosis, noting that many of the symptoms Parker complained of, including insomnia, irritability and heightened anxiety, reflected her mood disorder; she further found that Parker's "trauma-related symptoms" such as "nightmares" were "not prominent enough to cause dysfunction in all domains." *Id.* In any event, Dr. Abraham opined, "the intensive therapeutic services that Ms. Parker received following the sexual assault most likely reduced the presence of symptoms

19

associated with Post Traumatic Stress Disorder." *Id.*

Dr. Abraham also diagnosed Parker with Histrionic Personality Disorder (DSM-IV code: 301.50) based on her behavior during the evaluation and her physical appearance, including the fact that Parker's clothes were "emblazoned" with sequins, that she wore "excessive accessories," and her hair was "two-toned," which led Dr. Abraham to conclude Parker was seeking to "attract attention" to herself. *Id.* at 1182. She noted that "[i]n an attempt to control the session, she presented as manipulative and defiant, which compelled the examiner to split the evaluation into two sessions." *Id.* Dr. Abraham commented on the fact that Parker "often prematurely quit and whined that she could not complete the task." *Id.* at 1177. Further, she suggests that "[i]t is possible that Ms. Parker tends to over-dramatize her suffering and pain in order to seek attention and sympathy from others," though she found that "[b]ehavioral observations do not indicate any evidence of malingering." *Id.* at 1182, 1184.

Dr. Abraham found that on Axis III of the DSM, Parker "meets the criteria for Pain Disorder Associated with a General Medical Condition." *Id.* at 1183. This diagnosis was based on Parker's polycystic liver and renal disease as well as chronic back pain. *Id.* Dr. Abraham confirmed that complications from these medical conditions "sustain her mood disorder and lead to a sense of hopelessness." *Id.* Based on her physical and mental examination, Dr. Abraham concluded that Parker would "experience difficulty competing for jobs in an open labor market because of her limited mobility and accompanying chronic pain." *Id.* at 1185. Dr. Abraham further opined:

> Her lack of strength prevents her from doing heavy labor including carrying heavy objects, bending, and standing for long periods of time. Moreover, heightened stressors may result in an increase in anxiety and compel her to turn to drugs in order to cope and suggests a proclivity for risky behavior. Furthermore, Ms. Parker's depressive symptoms impacts [sic] her ability to carry out complex work assignments because of fatigue and low motivation. Moreover, if she relies on narcotic painkillers to ease her suffering, such as Morphine, she may not be able to sufficiently complete her assignments. These medications are central nervous system depressants and may exacerbate her symptoms of fatigue, irritability, and lack of focus and cause her to come across as disengaged and non-interactive. She would have difficulty maintaining attendance or arriving within appointed times. Further, completing a work-day without frequent rest breaks or interruptions from symptoms may pose a challenging environment. Hence, in the area of mental

abilities to attend, sustain effort comprehend or remember, she is rated as
moderately impaired.

*Id.* In addition, Dr. Abraham rated Parker as moderately impaired for "social interaction,"

because she is isolated and has limited interactions with friends and family. *Id.* at 1186.

Specifically, Dr. Abraham found that "Ms. Parker's irritable and controlling disposition

may interfere with her ability to maintain harmonious relations with others." *Id.* Dr.

Abraham evaluated Parker for her ability to adapt and concluded that she was moderately

impaired. *Id.* Her evaluation reads as follows:

> The occurrence of persistent depression suggests that Ms. Parker
> would have difficulty coping with daily or the usual stresses
> encountered in a competitive work environment. She would have
> difficulty adapting to changes in tasks or responsibilities because of
> her issues with chronic pain and depression. Specifically, her apathy
> in conjunction with lack of sleep due to insomnia may interfere with
> her ability to successfully hold a job.

*Id.* Finally, Dr. Abraham concluded that in light of Parker's various limitations, she "may be

considered to have a chronic or persistent psychiatric disability." *Id.*

### iii. Dr. Rivero, M.D.

Maria Rivero, M.D., a physician who evaluated Parker for the purpose of "providing

information to the disability office," examined Parker on October 23, 2014. *Id.* at 1403. In

addition, Dr. Rivero reviewed medical records from Alta Bates/Summit emergency department,

primary care provider notes and echocardiogram labs, Dr. Narra's records, Dr. Chawla's notes, Dr.

Kahlsa's evaluation, and St. Rose Hospital records. *Id.* Dr. Rivero concluded that Parker:

> can sit for up to 6 hours in an 8 hour work day with breaks every 30 minutes and
> stand or walk up to 2 hours in an 8 hour work day with breaks every 15 minutes to
> rest. She has an ulner [sic] neuropathy of the right arm and cannot lift, carry or
> lean on her R arm at or below the elbow. She cannot work over her head due to
> pain in her back and hips. She can carry 4 pounds or less occasionally with her L
> arm and 1 pound or less with her left arm. She doesn't have normal grip strength
> with either hand and therefore should not be doing jobs that require normal grip
> strength. She appears to have normal fine motor function of both upper
> extremities. She cannot push or pull objects with her right side and is limited to 4
> pounds or less of pulling or pushing on the left side. She takes narcotics daily and
> therefore should not be operating dangerous machinery or working at heights. She
> is unable to squat or kneel.

*Id.* at 1410.

**B.      Legal Background for Determination of Disabilities**

**Five Step Analysis**

Disability insurance benefits are available under the Social Security Act (the "Act") when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1).  The Commissioner has established a sequential, five-part evaluation process to determine whether a claimant is disabled under the Act.  *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  The claimant bears the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five.  *Id.*  "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps."  *Id.*

At step one, the Administrative Law Judge ("ALJ") considers whether the claimant is presently engaged in "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  If she is, the ALJ must find that she is not disabled.  *Id.*  If she is not engaged in substantial gainful activity, the ALJ continues the analysis.  *See id.*

At step two, the ALJ considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the regulations' twelve-month duration requirement.  20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii).  An impairment or combination of impairments is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant does not have a severe impairment, disability benefits are denied.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ determines that one or more impairments are severe, the ALJ proceeds to the next step.  *See id.*

At step three, the ALJ compares the medical severity of the claimant's impairments to a list of impairments that the Commissioner has determined are disabling ("Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 1.  If one or a combination of the claimant's impairments meets or equals the severity of a listed impairment, she is disabled.

20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the analysis continues.  *See id.*

At step four, the ALJ considers the claimant's residual functional capacity (RFC) in light of her impairments and whether she can perform past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv) (citing 20 C.F.R. § 404.1560(b)).  If she can perform past relevant work, she is not disabled.  *Id.*  If she cannot perform past relevant work, the ALJ proceeds to the final step.  *See id.*

At step five, the burden shifts to the Commissioner to demonstrate that the claimant, in light of her impairments, age, education, and work experience, can perform other jobs in the national economy.  *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997); *see also* 20 C.F.R. § 404.1520(a)(4)(v).  If the Commissioner meets this burden, the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(f).  Conversely, the claimant is disabled and entitled to benefits if there are not a significant number of jobs available in the national economy that she can perform.  *Id.*

2.          **Supplemental Regulations for Determining Mental Disability**

The Social Security Administration has supplemented the five-step general disability evaluation process with regulations governing the evaluation of mental impairments at steps two and three of the five-step process.  *See generally* 20 C.F.R. § 404.1520a.  First, the Commissioner must determine whether the claimant has a medically determinable mental impairment.  20 C.F.R. § 404.1520a(b)(1).  Next, the Commissioner must assess the degree of functional limitation resulting from the claimant's mental impairment with respect to four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(b)(2), (c).  Finally, the Commissioner must determine the severity of the claimant's mental impairment and whether that severity meets or equals the severity of a mental impairment listed in Appendix 1.  20 C.F.R. § 404.1520a(d).  If the Commissioner determines that the severity of the claimant's mental impairment meets or equals the severity of a listed mental impairment, the claimant is disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii).  Otherwise, the evaluation proceeds to step four of the general disability

inquiry.[4]  *See* 20 C.F.R. § 404.1520a(d)(3).

This evaluation process is to be used at the second and third steps of the sequential evaluation discussed above.  Social Security Ruling 96-8p, 1996 WL 374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process.").  If the Commissioner determines that the claimant has one or more severe mental impairments that neither meet nor are equal to any listing, the Commissioner must assess the claimant's residual functional capacity.  20 C.F.R. §§ 404.1520a(d)(3).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of the sequential process [and] requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments. . . ."  Social Security Ruling 96-8p, 1996 WL 374184, at *4.

### C.     Procedural History

Parker applied for Title II benefits on March 3, 2014 and for Title XVI benefits on March 6, 2014.  AR at 307, 314.  She alleged that she became unable to work because of her disabling conditions on December 31, 2008.  *Id.* at 527.  These include heart failure, nerve damage, kidney failure, liver failure, major depressive disorder, high blood pressure, PTSD, high cholesterol,

---

[4] Appendix 1 provides impairment-specific "Paragraph A" criteria for determining the presence of various listed mental impairments, but all listed mental impairments share certain "Paragraph B" severity criteria in common (and some have alternative "Paragraph C" severity criteria).  *See generally* 20 C.F.R. § 404, Subpt. P, App. 1 at 12.00.  Therefore, any medically determinable mental impairment—i.e., one that satisfies the Paragraph A criteria of one or more listed mental impairments—is sufficiently severe to render a claimant disabled if it satisfies the general Paragraph B criteria, which require that the claimant suffers at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration.  *See id.* A "marked" limitation is one that is "more than moderate but less than extreme" and "may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis."  *Id.* at 12.00C.

24

broken spine, and polycystic renal disease.  *Id.* at 220.  Parker's requests under both titles were denied on June 3, 2014.  *Id.* at 201, 206.  She filed a request for reconsideration on June 12, 2014.  *Id.* at 212.  That request was denied on September 12, 2014.  *Id.* at 214.  On October 3, 2014, Parker requested a hearing before an Administrative Law Judge ("ALJ").  *Id.* at 226.  A hearing was held on March 30, 2016.  *Id.* at 64.  A second hearing was held on October 27, 2016 at the request of Parker's counsel to address the report of Dr. Rana, who completed an internal medical evaluation on April 12, 2016 at the request of the state agency, as discussed above.  *Id.* at 18, 99, 102.  ALJ E. Alis issued an unfavorable decision on January 12, 2017.  *Id.* at 15–39.  Parker requested review by the Appeals Council, which was denied on January 24, 2018.  *Id.* at 1.  Following the rejection by the Appeals Council, Parker initiated this action for review under 42 U.S.C § 405(g).

### 1. The Hearings

The ALJ conducted the first hearing on March 30, 2016.  AR at 64.  The ALJ conducted a second hearing on October 27, 2016.  *Id.* at 516.  At both hearings, Parker and a vocational expert ("VE") testified.  The VE who testified at the second hearing, John Kilcher, offered the testimony upon which the ALJ relied in concluding that Parker was not disabled.

Kilcher testified that Parker's past work as a hair stylist was rated as skilled, SVP 6 and light level.  *Id.* at 111. The ALJ then posed a series of hypotheticals. First, the ALJ asked the VE if an "individual of [Parker]'s same age, education and with that job of a hairstylist," who is "limited to performing sedentary work as defined in the regulations" which means she can push, pull, "lift and/or carry ten pounds occasionally, less than ten pounds frequently" and who can sit or stand "two hours out of an eight-hour workday," and is limited to "repetitive tasks, making simple, work-related decisions" in a "setting where there are few changes" in either the appearance of the work setting or the "processes used," could "perform the past job" as described.  *Id.* at 113.  The VE responded that this hypothetical person could not be a hairstylist.  *Id.*  However, the VE said that this person could be a sorter (DOT 739.684-010), "classified at the sedentary level and unskilled, SVP of two."  *Id.* at 113–114.  In addition, he testified that the hypothetical person could be a weight tester (DOT 521.687-086) or assembler (DOT 739.684-094).  *Id.*  The VE noted

that the Dictionary of Occupational Titles ("DOT") does not address concerns like level of interaction with coworkers or people in general. *Id.* Therefore, his opinions as to the hypotheticals were based on his experience. *Id.* The ALJ also asked if there were any transferable skills from being a hairstylist that could lend themselves to employment opportunities. *See id.* The VE said that all possible jobs would require interaction with the public, so there were likely not any transferable skills due to the restrictions described above. *See id.* at 115.

Parker's counsel then asked the VE whether a person in the above hypothetical who also could not reach, handle, finger or feel would be able to perform the jobs he listed in response to the ALJ's hypotheticals. *Id.* The VE said there would not be any jobs for a person with these additional restrictions. *Id.* Parker's counsel also asked if a person with the same restrictions but who would be off task twenty percent of the time would be able to perform the jobs the VE listed. *Id.* The VE again answered no. *Id.* Finally, Parker's counsel asked if this hypothetical person would be able to perform these jobs if she also was required to miss two or more days per month for sick leave. *Id.* at 116. The VE responded that the jobs would not be available to such an individual with this additional restriction. *Id.*

The ALJ then posed a second hypothetical:

> [T]his individual is limited to performing light work as defined in our regulations, meaning she can lift and/or carry 20 pounds occasionally, 10 pounds frequently, can stand, walk or sit each six hours out of an eight-hour workday. She can push and/or pull as much as she can lift and/or carry. She would need to have a sit/stand up option where she could change positions briefly for up to two minutes after being in any one position for 30 minutes . . . And this individual can only occasionally stoop, kneel, crouch, climb ladders, ropes or scaffolds, occasionally climb ramps and stairs.

*Id.* at 117. The ALJ asked if a person fitting the above description would be able to perform the past job of a hairstylist. *Id.* The VE said that this individual could not, but the hypothetical person could be a garment sorter (DOT 222.687-014), stock checker (DOT 299.667-014), or garment folder (DOT 789.687-066), all categorized as light, unskilled, level 2 SVP. *Id.* at 117–118.

Parker's counsel then qualified this hypothetical, adding a limitation of not being able to reach with both arms, and asked if this person could do any of the jobs listed above. *Id.* at 119. The VE responded no. *Id.* Parker's counsel also asked if a person in the ALJ's second

hypothetical who also had to be able to lay down at unpredictable times could perform the jobs the VE had listed and the VE said no. *Id.*

Finally, the ALJ asked the VE to clarify how he interpreted "reaching" when he responded to counsel's added limitation above. *Id.* The VE said he interpreted it as reaching in any direction. *See id.* The ALJ then asked what the VE's testimony would be if the hypothetical person was "only restricted to no overhead reaching bilaterally." *Id.* at 120. The VE responded that a limitation only on overhead reaching would not disqualify someone from working the jobs he had listed because none of them requires overhead reaching. *Id.*

### 2. The ALJ's Decision

Employing the five-step evaluation process described above, the ALJ found that Parker had "not been under a disability within the meaning of the Social Security Act from December 31, 2008, through the date of this decision." *Id.* at 19.

At step one, the ALJ found that the record did not support a finding that Parker engaged in substantial gainful activity since the alleged onset date of December 31, 2008. *Id.* at 21. The ALJ also found that Parker "met the insured status requirements of the Social Security Act" on December 31, 2009. *Id.*

At step two, the ALJ found that Parker had the following severe impairments: (1) polycystic kidney, liver and ovarian disease, (2) osteoarthritis of the lumbar spine, (3) a mood disorder not otherwise specified (NOS), (4) an anxiety disorder "versus a posttraumatic stress disorder," and (5) a polysubstance addiction disorder. *Id.* The ALJ further found that Parker's "impairments significantly limit her ability to perform basic work activities," under 20 C.F.R. §404.1521 and §416.921, and therefore are deemed to be "severe." *Id.* The ALJ specifically excluded two other conditions noted in the record, stable osteoarthritis of the thoracic spine and hypertension, which he did not consider to be severe because they "do not contribute to the claimant's functional limitations." *Id.*

At step three, the ALJ determined that Parker's impairments did not meet or medically equal the severity of one of the listed impairments (together or in combination). *Id.* Specifically, the ALJ focused on Parker's gastrointestinal issues, spinal conditions and mental impairments. *Id.*

First, the ALJ found that Parker's symptoms do not meet the criteria in listing 5.00, "disorders of the digestive system." *Id.* at 21. The ALJ also did not find evidence of a spinal condition which would result in "the need for changes in position or posture more than once every two hours" or the "inability to ambulate effectively."[5] *Id.* With respect to Parker's mental impairments, the ALJ found that Listings 12.04[6], 12.06[7] and 12.09[8] were not met. *Id.* at 22. In order to make this determination, the ALJ evaluated whether or not the "Paragraph B" and "Paragraph C" criteria were satisfied; he did not address Paragraph A requirements. *Id.* He concluded that neither Paragraph B nor Paragraph C was satisfied. *Id.* To satisfy Paragraph B, the mental impairment in question must result in two or more of the following:

> marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

*Id.* With respect to the first category, "activities of daily living," the ALJ found that Parker has only mild restriction. *Id.* In support of the conclusion, the ALJ pointed to Parker's involvement in her church, ability to attend medical appointments consistently, concern for her physical appearance, and ability to work well with others and "use resources in the community well." *Id.* With respect to "concentration," the ALJ found that Parker has moderate difficulties, especially because of symptoms from chronic depression and possibly from side effects of pain medication.

---

[5] The ALJ did not identify a specific listing related to spinal conditions but it appears that he was considering listing 1.04, which relates to disorders of the spine.

[6] Listing 12.04 pertains to affective disorders, with "paragraph A" criteria requiring "[m]edically documented persistence" of: (1) "[d]epressive syndrome"; (2) "[m]anic syndrome"; or (3) "[b]ipolar syndrome." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.04.

[7] Listing 12.06 pertains to anxiety-related disorders, with the "paragraph A" criteria requiring that the claimant have "[m]edically documented findings of at least one of the following": "(1) [g]eneralized persistent anxiety accompanied" by certain listed symptoms; (2) "[a] persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation"; or (3) "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.06.

[8] Listing 12.09 pertains to "[b]ehavioral changes or physical changes associated with the regular use of substances that affect the central nervous system." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.06.

*Id.* The ALJ found that Parker has experienced no episodes of decompensation or "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause the individual to decompensate." *Id.* Therefore, the ALJ concluded that Parker did not satisfy the criteria of Paragraph C. *Id.* For these reasons, the ALJ concluded that Parker did not meet or equal a Listing at Step Three. *Id.* at 21. In support of his finding that Parker does not meet Listing 12.04, 12.06 or 12.09, the ALJ pointed to Dr. Abraham's opinion that Parker "likely overused her prescription narcotic pain medications, with resulting slurring of her words and appearance of lethargy" and that Parker has a "histrionic aspect, with over-dramatization of her symptoms." *Id.* at 24.

At step four, the ALJ found that Parker:

[H]as the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) (lift and carry 10 pounds frequently and 20 pounds occasionally; sit, stand, or walk for six hours each in an eight-hour workday, and push/pull to the same weight limits) except she occasionally could stoop, kneel, crouch, and climb (ladders, ropes, scaffolds, ramps, and stairs). She would need the option to change positions between sitting and standing briefly for up to two minutes after being in any one position for 30 minutes. She is limited to simple repetitive tasks with simple, work-related decisions, in a stable work environment, meaning few changes, if any, in the day-to-day work setting and in the tools and/or work processes used to accomplish tasks. She could have the occasional interaction with supervisors, co-workers, and the public but only superficial contacts such as pleasantries and greetings. She could not perform tandem tasks or work in a team or group.

*Id.* at 23. The ALJ explained that in reaching the RFC finding, he "considered all symptoms and the extent to which these symptoms reasonably can be accepted as consistent with the objective medical evidence and other evidence." *Id.* In assessing Parker's credibility, the ALJ concluded that Parker's "medically determinable impairments reasonably could be expected to cause the alleged symptoms." *Id.* at 24. However, the ALJ found that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with medical evidence and other evidence in the record. . . ." *Id.*

The ALJ gave "significant weight" to the opinions of the State agency consultants who

29

reviewed Parker's medical records because they "are consistent with the records they reviewed" and "provided adequate explanation for the discrepancies." *Id.* at 24. The ALJ acknowledged the note of Dr. Chawla that there is no known treatment to "prevent or delay" Parker's chronic kidney disease, but found that "to date, there has been no apparent worsening, acute treatment, or referral for dialysis." *Id.* at 25.

With regard to Parker's physical limitations, the ALJ "modified" the opinions of State agency reviewers based on the opinions of Dr. Rana, who examined Parker at the request of the state agency, as discussed above. *Id.* at 26. The ALJ found that Dr. Rana's "evaluation, when combined with the benign imaging findings indicates that overall . . . the claimant is capable of a range of light exertional work." *Id.* The ALJ also relied to a lesser extent on the opinions of Dr. Rivero, explaining that "Dr. Rana's limitations to occasional postural activity are uncontradicted by Dr. Rivero, so they are adopted." *Id.* However, the ALJ rejected Dr. Rivero's finding that Parker could "not lift more than four pounds." *Id.* at 27. The ALJ concluded that this finding was

> not supported by objective testing and is rejected in favor of the conclusions by the State agency and Dr. Rana . . . because these opinions are more consistent with the longitudinal medical record and objective evidence …

*Id.* The ALJ supports his decision to give Dr. Rana and the State agency consultants' opinions more weight than Dr. Rivero's on the basis that Dr. Rivero "appeared to rely more heavily on the claimant's subjective statements." *Id.*

With regard to Parker's mental impairments, the ALJ discounted the GAF score of 45 assigned by Tardy on December 18, 2013, pointing to other comments in Tardy's notes about Parker's daily activities and abilities that he concluded showed the GAF score "significantly understates the claimants functional capacity." *Id.* For example, the ALJ noted that Parker

> was active in her church, she had good insight into her mental condition, she attended appointments consistently, stayed in contact with her clinician, she could access all health care and make appointments independently…

*Id.* The ALJ also relied on treatment notes from November 2013 and September 2014 to suggest that Parker's mood had improved over time. *Id.* The ALJ cited Parker's report on November 26,

2013 that she had "never been this happy in [her] life" and noted that "[b]y September 2014, she was described as 'calm and in euthymic mood,' [and reported] decreased stress, positive experiences, and making new friends." *Id.*

Finally, the ALJ considered the opinion of Dr. Abraham, the State agency psychologist who evaluated Parker's mental condition. *Id.* at 28. The ALJ noted that Dr. Abraham described Parker as "moderately limited in her ability to attend, sustain effort, comprehend or remember; maintain social interactions; and adapt to the usual stress in a work environment." *Id.* The ALJ found that this was consistent with observations from Parker's social worker at ABODE. *Id.* Further, the ALJ posited that "her occasional slurred speech and slow affect appear related to her use or overuse of pain medications and not to an underlying psychological disorder." *Id.* The ALJ concluded that "taking into consideration her good presentation at most appointments but some concerns about interpersonal relationships, she is limited to simple unskilled work . . . . " *Id.* at 28.

At step five, the ALJ found that, "[c]onsidering [Parker's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Parker] can perform." *Id.* at 29. This decision was based on the vocational expert's testimony. *Id.* at 30. The VE testified that appropriate work for a hypothetical person with Parker's limitations existed in significant numbers, including "garment sorter," "stock checker," and "garment folder." *Id.*

### D. Plaintiff's Contentions

In her Motion for Summary Judgment, Parker contends the ALJ erred in giving little weight to the opinions of treating sources without providing "specific and legitimate reasons supported by substantial evidence." Pl.'s Mot. at ECF p.6. Further, Parker contends the ALJ erred in finding that she does not meet or equal a Listing. *Id.* at ECF p. 9. Finally, Parker argues that the ALJ erred in determining her RFC. *Id.* at ECF p. 10.

With respect to Parker's first contention, she argues that the ALJ improperly rejected – and did not even address – the opinions of Drs. Rasheed and Khetrapal, both treating physicians, about the limitations associated with Parker's chronic pain, which they opined would limit Parker to less

1   than sedentary work. *Id.* at ECF p. 7. Plaintiff further points out that Dr. Khetrepal's opinion was

2   based on the MRI findings of Dr. Khalsa but that the ALJ also failed to address those findings; nor

3   did he address the references to lumbosacral spondylosis and thoracic spondylosis in treatment

4   notes from TriCity Rheumatology, or Dr. Rasheed's opinions about Parker's limitations in the

5   October 25, 2016 RFC Questionnaire. *Id.*

6       Parker further asserts that the ALJ failed to offer specific and legitimate reasons for giving

7   reduced weight to the opinions of her treatment providers at ABODE Services, Ms. Tardy and Dr.

8   Harris, about her limitations. *Id.* at ECF p. 8. In particular, the ALJ failed to explain why

9   evidence that Parker experienced "some improvement at times" justified "brush[ing] off" their

10  opinions. *Id.* at 8 (internal citations omitted). Further, to the extent the ALJ relied on the opinions

11  of Dr. Abraham to support his conclusion, Parker claims that the ALJ mischaracterized Dr.

12  Abraham's opinions, ignoring her opinion that "Ms. Parker may be considered to have a chronic

13  or persistent psychiatric disability," which supports the conclusions of the ABODE clinicians. *Id.*

14  at ECF pp. 8–9 (internal citations omitted).

15      Parker also argues that the ALJ erred in finding that she does not meet or equal Listings

16  12.04, 12.06, and 12.09. *Id.* She contends that if he had given the opinions of the treating source

17  physician from ABODE appropriate weight, she would meet all three of the above listings. *Id.*

18  While the treating physician from ABODE noted that Parker would have "marked" limitations in

19  each of the categories, the ALJ found that she was "only mildly limited." *Id.* Parker notes that

20  this finding is even less restrictive than Dr. Abraham's conclusion. *Id.*

21      Finally, Parker contends that the ALJ erred in determining her RFC. *Id.* at ECF p. 10.

22  Specifically, she argues that the ALJ's conclusion was not supported by substantial evidence

23  because he did not give appropriate weight to the opinions of Dr. Khetrapal, Dr. Rasheed, Ms.

24  Tardy and Dr. Harris. *Id.* at ECF p. 11. She further argues that if these opinions were given

25  appropriate weight, the ALJ would have found that Parker cannot perform any of the jobs listed by

26  the Vocational Expert during the hearing. *Id.*

27      Parker argues that the proper remedy in this case is to reverse the decision of the

28  Commissioner and remand with instructions to award benefits because the ALJ did not "provide

legally sufficient reasons for rejecting the medical evidence." *Id.* at ECF p. 12.

## III.  ANALYSIS

### A.  Legal Standard Under 42 U.S.C §§ 405(g) and 1383(c)(3)

District courts have jurisdiction to review the final decisions of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decisions, with or without remanding for further hearings. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). When reviewing the Commissioner's decision to deny benefits, the Court "may set aside a denial of benefits only if it is not supported by substantial evidence or if it is based on legal error." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (quoting *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)) (quotation marks omitted). Substantial evidence must be based on the record as a whole and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence "must be 'more than a mere scintilla,' but may be less than a preponderance." *Molina v. Astrue*, 674 F.3d 1104, 1110–11 (9th Cir. 2012) (quoting *Desrosiers v. Sec'y of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988)). Even if the Commissioner's findings are supported by substantial evidence, "the decision should be set aside if the proper legal standards were not applied in weighing the evidence and making the decision." *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

If the Court finds defects in the administrative proceeding or the ALJ's conclusions that warrant reversal of the Commissioner's decision, the Court may remand for further proceedings or for award of benefits. *See Garrison v. Colvin*, 759 F.3d 995, 1019−21 (9th Cir. 2014).

### B.  Legal Standard for the Evaluation of Medical Opinions

The Ninth Circuit differentiates among the opinions of three different types of physicians. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The categories are as follows: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)." *Id.* "[T]he opinion of a treating physician is . . . entitled to greater weight than that

of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester v. Chater*, 81 F.3d at 830-831). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted). "Because a court must give 'specific and legitimate reasons' for rejecting a treating doctor's opinions, it follows even more strongly that an ALJ cannot in its decision totally ignore a treating doctor and his or her notes, without even mentioning them." *Marsh v. Colvin*, 792 F.3d 1170, 1172–73 (9th Cir. 2015). While harmless error analysis applies in the social security context, a failure to give adequate reasons for discounting the opinions of treating or examining physicians is only harmless if the reviewing court "'can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination.'" *Id.* (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1056 (9th Cir. 2006)).

Finally, "[i]f a treating provider's opinions are based 'to a large extent' on an applicant's self-reports and not on clinical evidence, and the ALJ finds the applicant not credible, the ALJ may discount the treating provider's opinion." *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008)). "However, when an opinion is not more heavily based on a patient's self-reports than on clinical observations, there is no evidentiary basis for rejecting the opinion." *Id.* (citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1199-1200 (9th Cir. 2008)).

C.    **Legal Standard for Weighing the Opinions of "Other Sources"**

"In addition to considering the medical opinions of doctors, an ALJ must consider the opinions of medical providers who are not within the definition of 'acceptable medical sources.'"

United States District Court
Northern District of California

*Revels v. Berryhill*, 874 F.3d 648, 655 (9th Cir. 2017) (citing 20 C.F.R. § 404.1527(b), (f); SSR 06-3p). If the medical provider who offers the opinion is not herself an acceptable medical source but is "working closely with, and under the supervision of [an acceptable medical source], her opinion is to be considered that of an 'acceptable medical source.'" *Turner v. Comm'r of Soc. Sec.*, 613 F.3d at 1223–24 (citing *Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996)). Otherwise, these medical sources are considered "other sources." While only "acceptable medical sources" can diagnose and establish that a medical impairment exists, evidence from "other sources" can be used to determine the severity of that impairment and how it affects the claimant's ability to work. *Catt v. Colvin*, No. 3:12-CV-02087-HZ, 2014 WL 98720, at *6 (D. Or. Jan. 8, 2014)(citing 20 C.F.R. § 404.1513(a), (d)). To disregard the opinion of an "other source" the ALJ is required to provide a reason that is "arguably germane" to that witness. *Id.* (citing *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001); *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223–24 (9th Cir. 2010)).

The same factors used to evaluate the opinions of medical providers who are acceptable medical sources are used to evaluate the opinions of those who are not. 20 C.F.R. § 404.1527(f); SSR 06-3p. Those factors include the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the doctor. *Id.* § 404.1527(c)(2)–(6). Under certain circumstances, the opinion of a treating source who is not an acceptable medical source may be given greater weight than the opinion of a treating source who is—for example, when the provider "has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole." 20 C.F.R. § 404.1527(f)(1).

### D. Legal Standard Governing Consideration of Evidence of Variations in the Claimant's Symptoms

It is "error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison*, 759 F.3d at 1017. Further, Social Security Ruling 96-7p states:

Symptoms may vary in their intensity, persistence, and functional effects, or may

worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

*Id.*; *see also Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001) (holding that notes of treating doctor must be "read in context of the overall diagnostic picture he draws" and opining, "[t]hat a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace.").

### E. The ALJ Erred in Evaluating Evidence of Parker's Physical Impairments

Parker asserts that the ALJ's decision should be reversed because the ALJ did not offer specific and legitimate reasons supported by substantial evidence for rejecting opinions of two treating doctors, Dr. Khetrapal and Dr. Rasheed, or even address these opinions. The Court agrees.

First, there is no question that the ALJ was required to provide specific and legitimate reasons for rejecting the opinions of Dr. Khetrapal, who was Parker's primary care physician from November 2013 to May 2014. He not only examined Parker on numerous occasions himself but also referred her to Dr. Khalsa, at Fremont Neurology Medical Associates, who reported to Dr. Khetrapal the results of a neurological and electrodiagnostic evaluation and an MRI that revealed multi-level desiccation, mild canal stenosis and right-sided neural foraminal stenosis, as well as "[e]xtensive bilateral renal cysts." AR at 1003-1004. The ALJ did not discuss Dr. Khetrapal's opinions at all in his decision, even though Dr. Khetrapal found Parker's limitations to be more severe than the RFC the ALJ adopted. In particular, as discussed above, Dr. Khetrapal found that Parker's could lift or carry no more than 10 pounds occasionally and could stand and walk less than two hours in an eight-hour day due to pain. *Id.* at 1108. He also found that Parker would need to alternate between, sitting, standing and walking frequently to alleviate her discomfort, opining that she could sit no more than 10 minutes without changing position, stand no more than 5 minutes without changing position, and needed to walk around every ten minutes for at least 5 minutes. *Id.* Finally, he found that Parker would need to be absent more than three times a month

due to her symptoms. *Id*. at 1109-1110.

The Commissioner argues that it was sufficient for the ALJ to cite to the opinions of the state agency doctors who reviewed the record because *those* doctors expressly rejected Dr. Khetrapal's opinions, finding that they were not consistent with objective findings. *See* AR at 175, 193. However, the Commissioner cites no authority suggesting that an ALJ is excused from providing specific and legitimate reasons for rejecting a treating physician's opinions simply because, buried in the record, there are notes by state agency reviewers setting forth reasons for rejecting a treating physician's opinion. Moreover, as these doctors did not examine or treat Parker, their opinions are entitled to less weight than the opinions of Dr. Khetrapal. The conclusory statements of these reviewers that Dr. Khetrapal's opinions are not consistent with objective medical findings are not specific and legitimate and would not be sufficient to support the ALJ's legal obligation to provide specific and legitimate reasons for his conclusions even if he *had* included them in his own written opinion. Accordingly, the Court concludes that the ALJ erred in failing to offer specific and legitimate reasons for rejecting the opinions of Dr. Khetrapal with respect to Parker's physical limitations.

With respect to the ALJ's failure to address references to Dr. Rasheed's diagnoses of lumbosacral spondylosis and thoracic spondylosis without myelopathy, Parker has not explained why these diagnoses would render the conclusions the ALJ did reach about Dr. Rasheed's opinions (which Parker does not challenge) invalid. The ALJ's failure to address the opinions contained in the RFC Questionnaire and Medical Opinion form that Dr. Rasheed completed in October 2016 is more problematic. In the wake of the Ninth Circuit's decision in *Taylor v. Comm"r of Soc. Sec*., 659 F.3d 1228, 1231 (9th Cir.2011), courts in the Ninth Circuit have found that where new evidence is submitted to the Appeals Council that was not considered by the ALJ, "the Appeals Council is not required to give specific and legitimate reasons for its rejection of a treating physician's evidence when it does not review the ALJ's decision." *Palomares v. Astrue*, 887 F. Supp. 2d 906, 916 (N.D. Cal. 2012). Nonetheless, the Appeals Council is still obligated to consider whether, in light of the new evidence, there is substantial evidence to support the ALJ's decision and the Commissioner's decision must still be reversed if that requirement is not met. *Id*.

As discussed above, in the forms that Dr. Rasheed completed in October 2016, she found that found that Parker had the following physical limitations: lifting and carrying less than 10 pounds; standing less than 2 hours in an 8 hour workday; walking less than 2 hours in an 8 hour workday; sitting less than 2 hours in an 8 hour workday; limited ability to push or pull as to both upper and lower extremities; and no climbing, balancing, stooping, kneeling, crouching or crawling. AR 40-41. In other words, Dr. Rasheed, who had continued to treat Parker in 2015 and 2016, found that Parker was significantly more limited in her abilities than Dr. Rana, who examined Parker only once, in 2016, and upon whom the ALJ relied heavily. Dr. Rasheed's findings are also closer to (and in some cases identical to) the limitations found by Dr. Khetrapal in 2014.

In sum, the Court finds that the ALJ erred by failing to provide specific and legitimate reasons supported by substantial evidence for rejecting the opinions of Dr. Khetrapal and the Commissioner's decision with respect to Parker's physical limitations also is not supported by substantial evidence in light of the opinions of Dr. Rasheed that were submitted to the Appeals Council before the ALJ's decision became final.

### F. The ALJ Erred in Evaluating Evidence of Parker's Mental Impairments

Parker contends the ALJ improperly weighed the opinions in the Mental Impairment Questionnaire completed by Tardy and signed by Dr. Harris. The ALJ rejected the opinion in the questionnaire that Parker likely would be absent from work more than four days per month due to her symptoms, which included dizziness, fatigue, and slurred speech attributed to side effects from medications. *Id*. at 24. The ALJ also rejected other limitations noted in the questionnaire, "including lack of ability to remember work procedures, complete a normal workday, and perform at a consistent pace." *Id*. The ALJ offered the following reasons for rejecting these opinions: 1) "there were treatment notes indicating that the claimant improved with treatment, with normal concentration and attention", *id*. at 27; 2) Dr. Abraham found that Parker had a "histrionic aspect, with over-dramatization of her symptoms," and that Parker overused her pain medication and would be able to "sustain simple and complex tasks for a 40-hour work week and interact adequately with others" if she did not overuse her pain medications, *id*. at 24; and 3) the activities

38

and abilities described in the questionnaire indicated that Parker's limitations were not as severe as was stated in the questionnaire. *Id*. at 27.

As a preliminary matter, to the extent the Commissioner suggests in his summary judgment motion that Tardy's opinion could be rejected under the standards that govern the evaluation of opinions of "other sources" because she is a social worker rather than a medical doctor, the Court rejects that argument. First, the ALJ made no such finding, apparently treating Tardy's evaluation as the opinion of an acceptable medical source. Second, substantial evidence in the records supports the conclusion that Tardy was entitled to be treated as an acceptable medical source, at least as to the opinions expressed in the assessment she completed on May 5, 2014, because she worked closely with and was under the supervision of Dr. Harris. As noted above, Dr. Harris was listed as the "consultant psychiatrist" at ABODE and prescribed Parker's medications. Even more significant is the fact that Dr. Harris waited to sign Tardy's Mental Impairment Questionnaire until she examined Parker, on June 17, 2014, indicating that Dr. Harris adopted the opinions expressed by Tardy in the questionnaire. Therefore, the Court concludes that the ALJ was required to give specific, legitimate reasons for rejecting the opinions expressed in the questionnaire with respect to Parker's limitations. The Court concludes that the ALJ's reasons for rejecting the opinions in the questionnaire completed by Tardy and signed by Dr. Harris are not specific and legitimate and are not supported by substantial evidence.

First, the ALJ's reliance on isolated treatment notes to conclude that Parker "improved with treatment" does not constitute a "specific, legitimate reason" supported by substantial evidence in the record for rejecting Tardy and Dr. Harris's opinions with respect to Parker's limitations. *See Garrison*, 759 F.3d at 1012. Although Tardy noted some instances of improvement in her treatment notes, "such observations must be 'read in context of the overall diagnostic picture' the provider draws." *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014) (quoting *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001)). "The fact that a person suffering from depression makes some improvement 'does

39

not mean that the person's impairment [ ] no longer seriously affect[s] [his] ability to function in a workplace.'"*Id.* (quoting *Holohan*, 246 F.3d at 1205). Here, the ALJ cherry-picked notes reflecting Parker's "good days" while ignoring the bad days, citing a note on November 26, 2013 when Parker told Tardy that she had "never been this happy in [her] life" and another note from a session almost a year later, in September 2014 2014 when she was described as in a "calm in euthymic mood" to show that Parker was improving. *See* AR at 24, 27.

Yet treatment notes by both Tardy and Dr. Kumar during the intervening months do not support the ALJ's reading of the record, instead showing that Parker's symptoms fluctuated, with both practitioners observing on numerous occasions that Parker's mood was depressed and anxious. *See, e.g.,* AR at 1084-1085 (notes from January 22, 2014 by Dr. Kumar reporting that Parker felt depressed and anxious and was having difficulty concentrating); *id.* at 1002 (notes from February 19, 2014 by Dr. Kumar that Parker complained of "more anxiety. . . depression" and "poor concentration."); *id.* at 1129 (notes from April 21, 2014 by Tardy observing that "client experienced PTSD symptoms," including "intrusive thoughts of fear, panic attacks, paranoia, and not wanting to be alone.). *Id.* at 1129. This fluctuation in symptoms is consistent with Dr. Abraham's finding of "mood instability" and her diagnosis of Mood Disorder Not Otherwise Specified, which the ALJ apparently adopted. It is also consistent with the diagnosis of Dr. Hiawatha Harris that Parker suffers from Bipolar Affective Disorder, *see id.* at 1249, and Dr. Rana's comment that Parker has a history of bipolar disorder. *Id.* at 1401. Despite apparently accepting Dr. Abraham's diagnosis, the ALJ did not address any of this evidence or acknowledge mood instability as a limitation that is relevant to Parker's ability to work. Therefore, the Court concludes that the ALJ's reading of the record with respect of Parker's mental limitations was not supported by substantial evidence and that the selective citation to days on which Parker was doing better was not a specific and legitimate reason for rejecting the limitations in the questionnaire completed by Tardy and Dr. Harris.

The ALJ's reliance upon the opinions of Dr. Abraham also does not constitute a specific and legitimate reason supported by substantial evidence for rejecting Tardy and

Dr. Harris's opinions with respect to Parker's mental limitations. Again, the ALJ reads Dr. Abraham's report selectively, ignoring significant aspects of her opinions that do not fit the ALJ's conclusions. Thus, he quotes Dr. Abraham's opinion that Parker "tends to overdramatize her suffering and pain in order to seek attention and sympathy from others," implying that Dr. Abraham found that Parker is malingering with respect to the severity of her symptoms, while ignoring Dr. Abraham's express finding that there was not "any evidence of malingering." *Id*. at 1184. The ALJ also ignores the conclusion that Dr. Abraham reached with respect to Parker's "histrionic" behavior, namely, that Parker meets the criteria of Histrionic Personality Disorder. *See id. at* 1182. Based in large part on this diagnosis, Dr. Abraham concluded that Parker has a "chronic or persistent psychiatric disability." *Id.* at 1186. Among other things, Dr. Abraham found that Parker's "irritable and controlling disposition may interfere with her ability to maintain harmonious relations with others," that her "sense of entitlement" and "defian[ce]" would lead her to "clash with positions of authority," that she was "not able to persist with the course of the assessment without it being split into two sessions" despite a "great deal of effort to comply with the requirements of completing tasks. *Id*. Therefore, the ALJ's reliance on Dr. Abraham's opinion about Parker's "histrionic" aspect does not constitute a specific and legitimate reason for rejecting the mental limitations found by Tardy and Dr. Harris.

In evaluating Parker's mental limitations and rejecting the limitations of Tardy and Dr. Harris, the ALJ also relied on Dr. Abraham's opinion that Parker likely "overused" her pain medication, concluding that without this overuse Parker "should be able to sustain simple and complex tasks for a 40-hour work week and interact adequately with others." *See id.* at 24. But while Dr. Abraham opined that Parker "may be overusing her pain medication," she offered no opinion as to Parker's ability to work if she did *not* overuse her pain medication. Instead, the ALJ relied on the opinion of one of the state agency doctors, Dr. Karen Ying, who reviewed the record but did not examine or treat Parker. Dr. Ying stated that "without over use of pain killers or with adjusted dosaging regime (changing amt or the medication to reduce sedation), she should be able to sustain simple

41

and complex tasks for a 40 hour work wk. She should be able to interact adequately with others in a work setting. She should be able to travel and make decisions in a work setting." AR at 170. As Dr. Ying did not examine or treat Parker and none of the doctors who did offered such an opinion (or even suggested that Parker's pain medication could be changed in a way that would both control her pain and eliminate or reduce the side effects associated of her pain medication), this opinion does not provide substantial evidence for the ALJ's finding. *See Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995), as amended (Apr. 9, 1996) ("The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician.").

Furthermore, "[t]he side effects of necessary medications are recognized as nonexertional limitations." *Nelson v. Comm'r of Soc. Sec.*, No. C 07-1810 PVT, 2010 WL 4973623, at *2 (N.D. Cal. Dec. 1, 2010) (citing *Allgrove v. Astrue*, 2009 WL 1814435, *6 (N.D.Cal.2009), citing *Tackett v. Apfel*, 180 F.3d 1094, 1102 (9th Cir. 1999)). "Like pain, the side effects of medications can have a significant impact on an individual's ability to work and should figure in the disability determination process." *Id.* (internal quotations and citations omitted). The record in this case is replete with observations and opinions from treatment providers that Parker's pain medication caused considerable mental impairment. *See, e.g.,* AR at 1185 (Dr. Abraham, stating "if she relies on narcotic painkillers to ease her suffering, such as Morphine, she may not be able to sufficiently complete her assignments. These medications are central nervous system depressants and may exacerbate her symptoms of fatigue, irritability, and lack of focus and cause her to come across as disengaged and non-interactive"); 1130 (Tardy notes from an April 18, 2014 appointment observing that Parker was "in a lethargic mood as evidenced by slurred speech and difficulty staying focused"); 1099 (Mental Impairment Questionnaire signed by Tardy and Dr. Harris stating that "Ms. Parker would currently have difficulty working at a regular job due to side effects from pain medications. These cause slurred speech and difficulty focus[ing], as well as decrease in memory functioning"), 1347 (Tardy notes from

42

United States District Court
Northern District of California

October 12, 2014 appointment observing that Parker "appeared intoxicated, or experiencing side effects of medication, due to showing difficulty in staying alert and showing slurred speech"). The ALJ acknowledged the symptoms associated with Parker's pain medications, *see* AR at 27 (citing October 12, 2014 notes by Tardy), but did not take them into account in determining Parker's functional limitations, concluding that these side effects could be avoided. This finding was not supported by substantial evidence, as discussed above.

Finally, the ALJ found that the GAF of 45 assigned by Tardy on December 18, 2013, *see id.* at 1318, did not accurately reflect Parker's ability to function because Tardy noted elsewhere in the assessment that Parker was able to schedule her own doctor appointments, take care of her hygiene and grooming and go to church; the ALJ also noted that Parker was "encouraged to" take college classes and participate in therapy. *See id.* at 27. The Court finds that these are not specific and legitimate reasons for rejecting the opinions of Tardy and Dr. Harris in the RFC Questionnaire signed by Dr. Harris on June 17, 2014. First, the comments in Tardy's assessment about the activities the ALJ cites shed little light on Parker's functional limitations. For example, Tardy notes only that it "would be good for Parker's mental health" if she took college classes – not that Parker actually enrolled in classes or that she was likely to be able to attend them. *See id.* at 1326. Likewise, there are no details in the assessment about how often Parker attended church or how long she remained there and it is unclear how her attending church shows that her functional abilities are greater than stated in the assessment. Nor does the ALJ explain why a recommendation that Parker participate in therapy supports the conclusion that Tardy and Dr. Harris have exaggerated Parker's functional limitations rather than supporting the opposite conclusion.

The ALJ also fails to address the notes in the assessment that *do* support Tardy and Dr. Harris's opinions about Parker's functional limitations, including a comment that Parker "often experiences symptoms of panic attacks, difficulty sleeping, loss of appetite, feelings of worthlessness, loss of energy, and diminished ability to concentrate." *Id.* at 1326. Tardy further notes that Parker "isolates herself when overwhelmed and finds difficulty in completing projects

43

or activities she wants to pursue . . . ." *Id.* In addition, Tardy states that Parker "often finds herself depending on others to assist her" and has "difficulty with employment and maintaining housing" due to her symptoms. *Id.* The ALJ does not address these notes, again citing selectively from the treatment records to support his conclusion.

For these reasons, the Court finds that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence for rejecting the opinions of Tardy and Dr. Harris with respect to Parker's mental limitations, which are more severe than is reflected in the ALJ's RFC.

### G.    Remedy

Once a district court has determined that an ALJ has erred, the court must decide whether to remand for further proceedings or to remand for immediate award of benefits. *Harman v. Apfel*, 211 F.3d 1172, 1177–78 (9th Cir. 2000). As a general rule, reversal of the Commissioner's decision results in remand for further proceedings, but a court may remand for award of benefits in "'rare circumstances,' . . . 'where no useful purpose would be served by further administrative proceedings and the record has been thoroughly developed.'" *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1100 (9th Cir. 2014) (quoting *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004) and *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (internal quotation marks omitted)). A court may remand for award of benefits under the credit-as true rule if all of the following requirements are satisfied: "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Harman*, 211 F.3d at 1178. In *Treichler*, the Ninth Circuit explained that in determining whether the second requirement is satisfied, courts should consider whether further proceedings would be useful to develop the record or resolve conflicts or ambiguities in the evidence. 775 F.3d at 1101.

The Court finds that all three requirements of the credit-as-true rule are satisfied in this case. First, the ALJ failed to provide legally sufficient reasons supported by substantial evidence for rejecting opinions of treating physicians Drs. Rasheed and Khetrapal about the limitations associated with Parker's physical impairments. These treating physicians agreed that Parker was

limited to less than sedentary work due to her chronic pain, and Dr. Khetrapal opined that Parker would miss more than three days of work every month. The ALJ also did not offer sufficient reasons supported by substantial evidence for rejecting the opinion of Dr. Harris and Clinical Social Worker Tardy about the limitations associated with Parker's mental impairments, including their opinions about the side-effects of Parker's pain medications, that Parker would miss four or more days a month of work and would be off task twenty percent of the time. The Court finds that there are no outstanding issues that need to be resolved on remand and that further proceedings are not required to resolve ambiguities in the evidence. Further, the VE's testimony at the hearing establishes that with the limitations found by these treatment providers, if credited as true, Parker cannot perform any of the jobs identified by the ALJ and therefore, that she should be found disabled at Steps Four and Five.[9] The Court therefore concludes that it is appropriate to remand for award of benefits under the credit-as-true rule.

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiff's motion for summary judgment, DENIES Defendant's motion for summary judgment and remands to the Social Security Administration for award of benefits.

**IT IS SO ORDERED.**

Dated: September 18, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge

---

[9] Because the Court find that a finding of disability is required based on Parker's RFC, it does not address whether Parker has also established that she is disabled at Step Three because her impairments meet or equal a Listing.

45